# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| KEVIN COIT, | : | |
|     Plaintiff, | : | |
| | : | No. 1:18-cv-02439 |
|     v. | : | |
| | : | (Judge Kane) |
| B. FISHER, | : | |
|     Defendant | : | |

## MEMORANDUM

Presently before the Court is the motion for summary judgment (Doc. No. 53) filed by Defendant B. Fisher ("Fisher").  The motion is fully briefed and ripe for disposition.  Also before the Court is pro se Plaintiff Kevin Coit ("Plaintiff")'s motion to amend his statement of facts in opposition to summary judgment.  (Doc. No. 63.)  For the reasons that follow, the Court will grant Plaintiff's motion to amend (Doc. No. 63) and consider his amended statement of facts (Doc. No. 63-1).  The Court, however, will deny Defendant Fisher's motion for summary judgment (Doc. No. 53).

## I.    BACKGROUND

Plaintiff initiated the above-captioned action on December 26, 2018, while incarcerated at the State Correctional Institution Smithfield in Huntingdon, Pennsylvania ("SCI Smithfield"), by filing a complaint pursuant to 42 U.S.C. § 1983 against Defendant Fisher.  (Doc. No. 1.)  In his complaint, Plaintiff alleges that Defendant Fisher is the Unit Manager of the Behavioral Management Unit ("BMU") at SCI Smithfield.  (Id. at 6.)  On October 11, 2018, Plaintiff told Defendant Fisher that inmates Rosa-Diaz, Segura, Brockington, and Smith were threatening to punch him in the face and, if they could not do that, throw semen, blood, urine, or feces on him or spit in his face.  (Id.)  Defendant Fisher told Plaintiff that he would not be moved to a new unit. (Id.)  That same day, Plaintiff filed a grievance and a request slip regarding his safety concerns.

(<u>Id.</u>)  On October 15, 2018, Superintendent Luther responded to the grievance, stating that Plaintiff's concerns were noted and had been forwarded to Defendant Fisher.  (<u>Id.</u>)  On October 16, 2018, Defendant Fisher responded to the request slip, noting that Plaintiff would not be moved at that time.  (<u>Id.</u>)

Plaintiff alleges that on October 17, 2018, inmate Faulk approached inmate Rosa-Diaz and showed him a request slip from Plaintiff to Defendant Fisher and told Rosa-Diaz that the request slip had been attached to a response to a grievance filed by inmate Brown.  (<u>Id.</u> at 7.)  On October 22, 2018, Plaintiff spoke to Defendant Fisher again, stating that inmate Rosa-Diaz was still making threats to cause harm and throw feces and spit on Plaintiff.  (<u>Id.</u>)  Defendant Fisher told Plaintiff "he would note the [safety] concerns but he [was] not moving Plaintiff."  (<u>Id.</u>)  That same day, Plaintiff submitted a request slip asking why Defendant Fisher was attaching his request slips to responses to other prisoners' grievances and voicing his safety concerns.  (<u>Id.</u>)

On October 23, 2018, Plaintiff was strip searched and taken to the BMU's exercise yard. (<u>Id.</u>)  Shortly thereafter, inmate Rosa-Diaz was brought out to the yard.  (<u>Id.</u>)  When officers tried to place inmate Rosa-Diaz next to Plaintiff, Plaintiff indicated that he could not be next to Rosa-Diaz "due to threats he made and [Defendant] Fisher has it marked in the books."  (<u>Id.</u>)  The officers responded that they were unaware of that, uncuffed Rosa-Diaz, said "enjoy yard," and left.  (<u>Id.</u>)  Plaintiff "continued to pace the yard" and Rosa-Diaz threw feces, striking Plaintiff in his head, face, and body.  (<u>Id.</u>)  Plaintiff yelled for the officers and alleges that he was "left outside covered in feces and being spit on for at least fifteen (15) minutes before [he] was taken to the shower."  (<u>Id.</u>)  On October 25, 2018, Plaintiff received a response from Defendant Fisher to his second request slip, stating that Plaintiff must have provided a copy of the request slip to inmate Brown and that staff do not pass such documents between inmates.  (<u>Id.</u>)  Based on the

foregoing, Plaintiff asserts violations of his Eighth and Fourteenth Amendment rights.  (Id. at 9.)

He requests declaratory and injunctive relief, as well as damages.[1]  (Id. at 10.)

In an Order dated February 26, 2019, the Court granted Plaintiff leave to proceed in forma

pauperis and directed service of his complaint upon Defendant Fisher.  (Doc. No. 15.)  Defendant

Fisher filed an answer to the complaint on May 30, 2019.  (Doc. No. 32.)  After receiving an

extension of the discovery and dispositive motions deadline (Doc. Nos. 47, 51), Defendant Fisher

filed his motion for summary judgment (Doc. No. 53) on May 5, 2020 and his supporting

materials on May 19, 2020 (Doc. Nos. 56, 57).  On May 20, 2020, observing that Defendant

Fisher raised the issue of whether Plaintiff properly exhausted his administrative remedies with

respect to his claims in accordance with the Prison Litigation Reform Act ("PLRA"), the Court

issued a Paladino Order informing the parties that it would consider the exhaustion issue in the

context of summary judgment and, by doing so, would consider matters outside the pleadings in

its role as factfinder.[2]  (Doc. No. 58.)  The Court directed Plaintiff to file a brief in opposition

addressing the issue of administrative exhaustion and a statement of material facts responding to

Defendant Fisher's statement within thirty (30) days.  (Id.)  Plaintiff filed his response on

February 18, 2020 (Doc. Nos. 59, 60, 61), and Defendant Fisher filed his reply on June 24, 2020

(Doc. No. 62).

---

[1] The docket in the above-captioned case reflects that Plaintiff is now incarcerated at SCI
Rockview.  Plaintiff's transfer, therefore, renders his claims for declaratory and injunctive relief
moot.  See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003) (noting that "[a]n inmate's
transfer from the facility complained of generally moots the equitable and declaratory claims" for
relief).

[2] See Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018).

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the

motion "must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, Civ. No. 09-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ. No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

## III.   STATEMENT OF MATERIAL FACTS[3]

### A.   Events in the BMU

The BMU "is designed for an inmate who exhibits 'severe Personality Disorder with functional impairment, chronic disciplinary issues, and [who] demonstrates an inability to adapt to a general population setting.'"  (Doc. No. 57 ¶ 21.)  Inmates in the BMU "are housed in disciplinary/administrative custody, and are not permitted to freely interact with the other inmates

---

[3] The Local Rules provide that in addition to the requirement that a party file a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  See M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements.  See id.  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  See id.  Unless otherwise noted, the background herein is derived from Defendant Fisher's Rule 56.1 statement of facts.  (Doc. No. 57.)

Plaintiff initially did not comply with Local Rule 56.1 in that he failed to respond specifically to the numbered paragraphs in Defendant Fisher's statement of material facts. Rather, Plaintiff filed his own statement of material facts without regard to that of Defendant Fisher.  (Doc. No. 60.)  Plaintiff attempted to correct this defect by filing his motion to amend (Doc. No. 63) and a corrected responsive statement of facts (Doc. No. 63-1).  While the Court will grant Plaintiff's motion to amend, his corrected responsive statement of facts still does not comply with Local Rule 56.1 because his denials of Defendant Fisher's allegations contain no reference to the record.  The Court, therefore, will only consider those facts presented by Plaintiff that are properly supported by record citations.  See Lynch v. Ducasse, No. 3:18-cv-2044, 2020 WL 3547375, at *2 (M.D. Pa. June 30, 2020).  While Plaintiff's verified complaint (Doc. No. 1) may be treated as an affidavit in opposition to the motion for summary judgment, the allegations must be based on personal knowledge, and this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."  See Hammonds v. Collins, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing Brooks v. Am. Broad. Co., 999 F.2d 167, 172 (6th Cir. 1993)).  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendant Fisher to be undisputed.  See M.D. Pa. L.R. 56. 1; Fed. R. Civ. P. 56(e)(2); Bowman v. Mazur, Civ. No. 08-173J, 2010 WL 2606291, at *3 (W.D. Pa. Oct. 30, 2010) ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1.").

in the BMU, due to their inability to behave appropriately in general population."[4]  (Id. ¶ 22.)

Treatment is "based upon a 'Phase System' involving five phases, with a Phase 5 inmates needing

the most treatment and receiving the least privileges, and a Phase 1 inmates needing the least

treatment and receiving the most privileges."  (Id. ¶ 23.)  The BMU at SCI Smithfield "has two

wings: A and B."  (Id. ¶ 24.)  "Inmates in the BMU are offered up to one hour of recreation each

day in a single exercise yard."[5]  (Id. ¶ 25.)

Plaintiff was housed in the BMU while incarcerated at SCI Smithfield.  (Id. ¶ 26.)  In

September 2018, he was transferred from A wing to B wing "because he was not interacting

appropriately with the inmates on A wing."  (Id. ¶ 27.)  "Plaintiff complained to Unit Manager

Fisher and others that he wanted to be moved back to A wing because the inmates in the B wing,

including inmate Diaz, were verbally harassing him."[6]  (Id. ¶ 28.)  Plaintiff "verbally harassed

Inmate Diaz, as well."  (Id. ¶ 29.)

In the BMU, an inmate is to sign up to use the yard.  (Id. ¶ 30.)  On October 23, 2018,

Plaintiff signed up to use the yard and "went for exercise in his single exercise yard."  (Id. ¶ 31.)

He saw that inmate Rosa-Diaz was being placed in a single exercise yard next to his.  (Id.)

"Plaintiff told the officers that Inmate Rosa-Diaz should not be next to him 'due to threats he

---

[4] Plaintiff maintains that "part of the BMU is to interact with other prisoners housed in the program."  (Doc. No. 63-1 ¶ 22.)

[5] Plaintiff avers that "inmates housed in the BMU are afforded an AC yard and a DC yard."  (Id. ¶ 23.)  He asserts that the AC yard "permits phase 3, 3 modified[,] and phase 2 [inmates] to utilize the basketball hoop[,] pull up bar[,] and more space outside of the cages and at minimum is two prisoners at a time and in order to proceed to the next phase participation is mandatory."  (Id.)  During phase two, "6 inmates participate in general population yard and activities without pens."  (Id.)

[6] Plaintiff states that he did not just complaint of verbal harassment but also complained that "the inmates were making threats to assault" him.  (Id. ¶ 28.)

made and (UM) Fisher has it marked in the books' but the officers stated that they knew nothing about that."  (Id.)  Inmate Rosa-Diaz threw feces through the fence, hitting Plaintiff.  (Id. ¶ 32.) Plaintiff "then notified an officer and was afforded a shower."  (Id. ¶ 33.)  Plaintiff "is variously on good and bad terms with Inmate Rosa-Diaz," and "was generally on good terms with Inmate Rosa-Diaz before the incident in the yard."[7]  (Id. ¶¶ 34-35.)  "Inmate Rosa-Diaz apologized to Plaintiff for the incident."  (Id. ¶ 37.)

### B.    Administrative Exhaustion

The Department of Corrections ("DOC") has "established an inmate grievance review system to provide prisoners in its custody with a regular procedure to resolve problems or other issues arising during the course of their confinement."  (Id. ¶ 1.)  This procedure is set forth in Administrative Directive 804 ("DC-ADM 804").  (Id.)  "[A]ny inmate personally affected by a Department or institutional action or policy or by the action of a Department employee may file a grievance."  (Id. ¶ 2.)  Inmates are encouraged to pursue informal resolution before filing a grievance.  (Id.)  All inmates are provided an inmate handbook, which includes a copy of the grievance system policy and procedures, upon arrival at one of the DOC's diagnostic and classification centers.  (Id. ¶ 4.)  Inmates are also provided "notice of any revisions to the policy and procedures manual."  (Id.)  Moreover, "when an inmate is assigned to a permanent institution, a copy of the grievance system policy and procedures manual is available on all housing blocks and in the institutional library for inmates to review or request to obtain copies."  (Id.)

DC-ADM 804 sets forth a three-tiered grievance system: "(1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the

---

[7] Plaintiff maintains that he was on good terms with inmate Rosa-Diaz until his request slip was shown to inmate Rosa-Diaz.  (Id. ¶ 35.)

[Secretary's Office of Inmate Grievances and Appeals ('SOIGA')]."  (Id. ¶ 5.)  First, "[a]n inmate must submit a grievance in writing to the Facility Grievance Coordinator, using the grievance form which is available on all housing units or blocks, as well as in the main and mini-law libraries."  (Id. ¶ 6.)  The grievance must include: (1) a statement of relevant facts not exceeding two (2) pages; (2) the date, time, and location of the events; (3) the individuals involved; (4) any claims concerning violations of DOC directives, regulations, court orders, or other law; and (5) the relief sought.  (Id. ¶ 7.)  Moreover, "[a]ny grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim."  (Id. ¶ 8.) An initial review grievance must be submitted to the Facility Grievance Coordinator within fifteen (15) working days after the event upon which the claim is based.  (Id. ¶ 9.)  The Facility Grievance Coordinator or designee assigns a tracking number to every grievance and enters it into the Automated Inmate Grievance Tracking System.  (Id. ¶ 10.)

An inmate may appeal the Initial Review Response or a rejection of a grievance to the Facility Manager (the Superintendent) "within fifteen working days from the date of the Initial Review Response or Grievance Rejection."  (Id. ¶ 11.)  The appeal "must contain the reasons for the appeal.  Only an issue that was raised for Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed."[8]  (Id. ¶ 12.)  The Facility Manager then provides a response, which "may, among other things: Uphold the Initial Review Response, Uphold Inmate, Dismiss, Uphold in Part/Deny in Part, or Remand."  (Id. ¶ 13.)  An inmate who is not satisfied with the Facility Manager's response may then submit an Inmate Appeal to Final Review "within 15 working days from the date of the Facility Manager's

[8] Plaintiff contends that if new facts arise inmates may raise those new facts in an appeal of the original grievance.  (Id. ¶ 12.)

decision, to [SOIGA]." (Id. ¶ 14.)  SOIGA may consider only issues that were raised in both the initial grievance and the appeal to the Facility Manager.[9]  (Id. ¶ 15.)  "An appeal must 'be legible, understandable, and presented in a courteous manner.'" (Id. ¶ 16.)  The inmate must include "copies of the Initial Grievance, the Initial Review Response, the Inmate Appeal to the Facility Manager (Superintendent), and the Facility Manager/designee's Response."  (Id. ¶ 17.)  SOIGA "then may, among other things: Uphold Response, Uphold Inmate, Dismiss, Uphold in Part/Deny in Part, or Remand."[10]  (Id. ¶ 18.)

Plaintiff filed Grievance 766853 about the events underlying his complaint in the above-captioned case.  (Id. ¶ 19.)  SOIGA dismissed Plaintiff's final appeal of this grievance "because Plaintiff did not include the proper documentation with his appeal pursuant to ADM-804, particularly a copy of his Appeal to the Superintendent."  (Id. ¶ 20.)

## IV.    DISCUSSION

Defendant Fisher maintains that he is entitled to summary judgment because: (1) Plaintiff failed to exhaust his administrative remedies, as required by the PLRA, before filing the above-captioned case; (2) he was not deliberately indifferent to a significant risk of serious harm to Plaintiff; and (3) he is entitled to qualified immunity.[11]  (Doc. No. 56 at 4.)  The Court considers Defendant Fisher's arguments in turn.

---

[9] Plaintiff avers that "all [pertinent] information that is relev[ant] to appeals must be raised on appeal."  (Id. ¶ 15.)

[10] Plaintiff argues that ADM-804 states "that a grievance without proper document[ation] can be halted and [that a prisoner can be notified] that documents were not attached to [the] grievance and that these documents need to be sent in or [the] grievance will be [dismissed]."  (Id. ¶ 18.)

[11] As noted supra, Plaintiff also asserts a violation of his equal protection rights under the Fourteenth Amendment.  (Doc. No. 1 at 5, 9.)  Plaintiff vaguely suggests that Defendant Fisher did not allow him to "utilize the block television" as he wanted, but allowed everyone else to do so.  (Id. at 8.)

### A.      Administrative Exhaustion

Pursuant to the PLRA, a prisoner must pursue all available avenues of relief through the

applicable grievance system before initiating a federal civil rights action.  See 42 U.S.C.

§ 1997e(a); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust

irrespective of the forms of relief sought and offered through administrative avenues.").  Section

1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison

conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative remedies as are available

---

The Equal Protection Clause requires state actors to treat all persons who are "similarly situated" equally.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Traditionally, "[i]n order to establish a prima facie case of discrimination under the Equal Protection Clause, [plaintiffs] need[] to prove that they were members of a protected class [such as race or gender] and that they received different treatment than that received by similarly-situated individuals."  See Oliveira v. Twp. of Irvington, 41 F. App'x 555, 559 (3d Cir. 2002).  However, where a plaintiff alleges that he alone "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," he may raise a "class of one" equal protection claim.  See Enquist v. Or. Dep't of Agric., 553 U.S. 591, 598 (2008).  To maintain such a claim, a plaintiff must establish that he has been irrationally singled out for disparate treatment.  See id.  "[A]t the very least, to state a claim under [a class of one theory], a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."  Mosca v. Cole, 217 F. App'x 158, 164 (3d Cir. 2007).  When alleging the existence of similarly situated individuals, plaintiffs "cannot use allegations . . . that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief," and "bald assertion[s] that other[s] . . . were treated in a dissimilar manner" will not suffice.  See Young v. New Sewickley Twp., 160 F. App'x 263, 266 (3d Cir. 2005) (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)).

In the instant case, Plaintiff does not state that he is a member of a protected class.  Indeed, prisoners are not a protected class of individuals.  See Abdul-Akbar v. MeKelvie, 239 F.3d 307, 317 (3d Cir. 2001) (concluding that prisoners are not a subject class).  Moreover, nothing in the record suggests that Defendant Fisher intentionally treated Plaintiff differently from other inmates or treated other inmates more favorably in any respect.  Plaintiff's allegations that his equal protection rights were violated are simply "bald assertions" that fail to allege "occasions and circumstances" of different treatment.  See Young, 160 F. App'x at 266.  In any event, during his deposition, Plaintiff confirmed that the above-captioned case is solely concerned with the October 23, 2018 incident with inmate Rosa-Diaz and that he is not advancing any claims related to the block television.  (Doc. No. 57-7 at 45.)

are exhausted."  See 42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  See

Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 742 (holding

that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the

relief offered through administrative procedures").

　　The United States Court of Appeals for the Third Circuit has further provided that there is

no futility exception to Section 1997e's exhaustion requirement.  See Nyhuis v. Reno, 204 F.3d

65, 75-76 (3d Cir. 2000).  Courts have typically required across-the-board exhaustion by inmates

seeking to pursue claims in federal court.  See id.  Additionally, courts have interpreted this

exhaustion requirement as including a procedural default component, holding that inmates must

fully satisfy the administrative requirements of the inmate grievance process before proceeding

with a claim in federal court.  See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); see also Oriakhi

v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be

unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion

requirement by exhausting administrative remedies after the filing of the complaint in federal

court").  Courts have also concluded that inmates who fail to complete the prison grievance

process in a full and timely manner are barred from subsequently litigating claims in federal

court.  See, e.g., Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Booth v. Churner, 206 F.3d

289 (3d Cir. 2000).

　　This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the

actions of prison officials directly caused the inmate's procedural default as to a grievance, the

inmate will not be required to comply strictly with this exhaustion requirement.  See Camp v.

Brennan, 219 F.3d 279 (3d Cir. 2000).  However, courts also recognize a clear "reluctance to

invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires."  See

12

Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," see Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate."  See Warman, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused.  An inmate, therefore, may not excuse a failure to comply with these grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement.  See Harris, 149 F. App'x at 59.  Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him.  See Warman, 49 F. App'x at 368.  Consequently, an inmate's confusion regarding these grievances procedures does not, alone, excuse a failure to exhaust.  See Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003); see also Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing.'" (citations omitted)).

Recently, the Supreme Court considered what renders administrative remedies unavailable to an inmate such that a failure to exhaust may be excused.  See Ross v. Blake, 136 S. Ct. 1850 (2016).  The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  See id. at 1859.  First, an administrative procedure is not available "when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  See id.  Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use."  See id.  Finally, a procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation."  See id. at 1860.  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."  See Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018).  The Third Circuit recently established that:

> to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff, an inmate must show (1) that the misrepresentation is one which a reasonable inmate would be entitled to rely on and sufficiently misleading to interfere with a reasonable inmate's use of the grievance process, and (2) that the inmate was actually misled by the misrepresentation.

Hardy v. Shaikh, 959 F.3d 578, 588 (3d Cir. 2020).

In the instant case, Defendant Fisher argues that Plaintiff failed to exhaust his administrative remedies properly prior to filing suit.  (Doc. No. 56 at 5-8.)  Specifically, Defendant Fisher maintains that Plaintiff failed to properly appeal Grievance 766853 because he did not include a copy of his Inmate Appeal to the Superintendent in his appeal to SOIGA.  (Id. at 7-8.)  In response, Plaintiff asserts that he "immediately looked inside of the DC-ADM 804 to see if there were any instructions on what an inmate should do when faced with a[n] issue like this, but [he] discovered that there are no instructions on what a[n] inmate should do."  (Doc. No. 59 at 1-2.)  Plaintiff maintains that he wrote to Keri Moore and "told her that he did [send] her a copy of the appeal to the Facility Manager, [and] also included another copy of his appeal to the Facility Manager to Ms. Moore along with another whole appeal."  (Id. at 2.)  According to Plaintiff, he "never received anything from Ms. Moore or the SOIGA in regards to his letter to

Ms. Moore or his new appeal." (Id.)  Plaintiff asserts further that he submitted a request slip asking for copies of the requisite documents.  (Doc. No. 60 at 1.)  In his reply brief, Defendant Fisher argues that "even accepting that it is true that Plaintiff asked for copies of his grievances, and that those copies were not timely provided for his appeal, this does not absolve him from following the ADM-804."  (Doc. No. 62 at 3.)  Defendant Fisher maintains further that "Plaintiff has not proven that he asked for copies."  (Id. at 4.)

The Court is not persuaded by Defendant Fisher's argument that he is entitled to summary judgment with respect to the issue of exhaustion.  The Court has reviewed the many request slips and grievance the parties submitted regarding the issue of exhaustion.  In support of his motion for summary judgment, Defendant Fisher submitted a copy of an Inmate Appeal to Final Review, related to Grievance 766853, submitted by Plaintiff on November 27, 2018.  (Doc. No. 57-3 at 7.) In that document, Plaintiff asserted that he had requested a copy of his Inmate Appeal to the Facility Manager but that Lisa Hollibaugh refused to provide him a copy.  (Id.)  Moreover, Plaintiff's submissions indicate that he attempted to resubmit his appeal, along with a copy of the Inmate Appeal to the Facility Manager, to SOIGA.  (Doc. No. 61-4 at 7.)  Many of Plaintiff's other submissions reflect that several occasions, Plaintiff expressed concerns that he either was not receiving responses to his grievances or that grievances he submitted were not being handled properly.  Given these submissions, the Court concludes that a genuine issue of fact exists as to whether the grievance process was rendered unavailable to Plaintiff such that his failure to properly exhaust Grievance 766853 could be excused.  See Cameron v. Swartz, 810 F. App'x 143, 146 (3d Cir. 2020) (finding that a facility manager's failure to respond to the inmate-plaintiff's request for copies of his appeals in order to submit them to SOIGA "thwarted his efforts to exhaust the grievance process" and concluding that the district court erred in concluding

that the inmate-plaintiff failed to exhaust his administrative remedies).  Thus, the Court declines

to grant summary judgment on the basis that Plaintiff failed to properly exhaust his failure to

protect claim against Defendant Fisher.  Accordingly, the Court considers the merits of Plaintiff's

claim below.

> **B.**     **Merits of Plaintiff's Failure to Protect Claim**

The Eighth Amendment requires prison officials to "take reasonable measures to protect

prisoners from violence at the hands of other prisoners."  See Farmer v. Brennan, 511 U.S. 825,

833 (1994).  While prison officials have the duty to protect prisoners from attacks by other

prisoners, not every injury suffered by a prisoner at the hands of another implicates liability for

the officials responsible for that inmate's safety.  See id. at 833-34.  Rather, an inmate raising a

failure to protect claim under the Eighth Amendment must establish that a prison official both

knew of and chose to disregard an "excessive risk to inmate health or safety."  See Beers-Capitol

v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 837).  This knowledge

requirement is subjective, "meaning that the official must actually be aware of the existence of the

excessive risk; it is not sufficient that the official should have been aware."  See id.; see also

Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997).  Actual knowledge may be proven

circumstantially in situations where the general danger was obvious.  See Farmer, 511 U.S. at

842.  For example, if the prisoner:

> presents evidence showing that a substantial risk of inmate attacks was
> "longstanding, pervasive, well-documented, or expressly noted by prison officials
> in the past, and the circumstances suggest that the defendant-official being sued had
> been exposed to information concerning the risk and thus 'must have known' about
> it, then such evidence could be sufficient to permit a trier of fact to find that the
> defendant-official had actual knowledge of the risk."

Id. at 842-43 (quotation omitted).  However, "a defendant can rebut a prima facie demonstration

of deliberate indifference either by establishing that he did not have the requisite level of

knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring."  See Beers-Capitol, 256 F.3d at 133.

Defendant Fisher asserts that he is entitled to summary judgment because: (1) he was not deliberately indifferent to a significant risk of serious harm to Plaintiff; (2) he had insufficient personal involvement because he did not cause Plaintiff's injury; and (3) he is entitled to qualified immunity.  (Doc. No. 56 at 8-15.)  In response, Plaintiff avers that Defendant Fisher violated his Eighth Amendment rights by ignoring his written and verbal complaints about inmate Rosa-Diaz and "by not communicating to his fellow officers that [P]laintiff and inmate Diaz should be separated or at least watched closely."  (Doc. No. 59 at 2.)  In his reply brief, Defendant Fisher maintains that Plaintiff has not created a genuine dispute of fact regarding whether he was deliberately indifferent.  (Doc. No. 62 at 4-5.)

In support of summary judgment, Defendant Fisher has submitted a declaration indicating that Plaintiff, as an inmate designated to the BMU, was already "housed in disciplinary/administrative custody and [was] not permitted to freely interact with the other inmates in the BMU."  (Doc. No. 57-4 at 1-2.)  He notes further that inmates housed in the BMU "are offered up to one hour of recreation each day in a single exercise yard" and are "separated by fencing from other inmates who may be in adjacent single exercise yards."  (Id. at 2-3.) Defendant Fisher suggests, therefore, that because "Plaintiff was in this more protective setting, [he] was reasonable to believe that precautions were in place to prevent serious harm."  (Doc. No. 56 at 10.)  Defendant Fisher maintains that he "was not aware that Plaintiff volunteered to go to yard on October 23, 2018, and was placed in a single exercise yard that was adjacent, but separated by a fence, to a single exercise yard that housed Inmate Diaz."  (Doc. No. 57-4 at 3.) Defendant Fisher also relies upon Plaintiff's deposition, in which Plaintiff admitted that he was

generally on good terms with inmate Rosa-Diaz and that they had engaged in mutual verbal harassment before the assault occurred.  (Doc. No. 57-7 at 29, 43.)

Plaintiff, however, has submitted a verified complaint, which serves as an affidavit in opposition to summary judgment.  See Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985).  He has also submitted copies of his request slips and grievances in which he reported the threats by inmate Rosa-Diaz and others, as well as an affidavit by inmate Rosa-Diaz.[12]  In his complaint, Plaintiff avers that he submitted grievances and request slips regarding the threats made by inmate Rosa-Diaz and others and that he also verbally complained of those threats to Defendant Fisher. (Doc. No. 1 at 6-7.)  Plaintiff maintains further that Defendant Fisher's responses to his grievances and request slips somehow made their way to inmate Rosa-Diaz.  (Id. at 7.)  Copies of Plaintiff's request slips and grievances indicate that Plaintiff advised Defendant Fisher of his concerns regarding the threats and his concerns that responses to such had been provided to inmate Rosa-Diaz.  (Doc. No. 61-3 at 5-11.)  Plaintiff's complaint suggests further that despite knowing of his concerns, Defendant Fisher failed to communicate them to other officers in the BMU.  (Doc. No. 1 at 7.)

In his affidavit, inmate Rosa-Diaz states that on October 22, 2018, Defendant Fisher asked "what was [his] problem with inmate Coit, because he had heard me threatening Coit on numerous [occasions]."  (Doc. No. 61-1 at 15.)  Rosa-Diaz indicated that he did not have any problems with Plaintiff, and Defendant Fisher showed him some request slips written by Plaintiff asking for a separation from him and other inmates because of threats.  (Id.)  Rosa-Diaz avers that

---

[12] While Plaintiff has submitted an "affidavit" in support of his claim (Doc. No. 61 at 1-8), this filing does not indicate that the statements contained therein are true and correct and is not signed under the penalty of perjury.  The Court, therefore, will not consider this "affidavit" as evidence that would rebut Defendant Fisher's motion for summary judgment.  See Christian v. Garman, No. 3:18-cv-1363, 2020 WL 416847, at *2 n.1 (M.D. Pa. Jan. 27, 2020).

Defendant Fisher "stated to me that inmate Coit was in fear for his safety, but that Fisher was going to let me have fun with Coit, and that Coit needed to [man] up."  (Id.)  When he returned to his cell, inmate Rosa-Diaz told Plaintiff "that [he] was going to get him by any means necessary." (Id.)  The next day, inmate Rosa-Diaz assaulted Plaintiff by throwing feces on him.  (Id.)

Upon consideration of the evidence presented by the parties, the Court concludes that there exist genuine issues of material fact regarding whether Defendant Fisher chose to disregard an "excessive risk to [Plaintiff's] health or safety."  See Beers-Capitol, 256 F.3d at 133.  Although Defendant Fisher contends that Plaintiff's "admissions about his disruptive conduct cut against his complaints that he was in danger" (Doc. No. 56 at 10), the undisputed facts indicate that, despite the verbal sparring, Plaintiff, not inmate Rosa-Diaz, was the one who was assaulted by feces.  Defendant Fisher argues further that Plaintiff feigned a fear of harm to manipulate a transfer back to the A wing.  (Id. at 11.)  The existence of genuine issues of material fact, however, preclude the Court from making that determination at this time.  These issues of fact turn on a credibility assessment, a task in which this Court may not partake at the summary judgment stage.  See Anderson, 477 U.S. at 252.  Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Fisher chose to disregard an excessive risk to Plaintiff's safety. Accordingly, the Court will deny summary judgment as to Plaintiff's failure to protect claim.

### C.    Qualified Immunity

As noted supra, Defendant Fisher asserts that he is entitled to qualified immunity.  (Doc. No. 56 at 12-15.)  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."

Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)).  In order to determine whether a right was clearly established, the Court must ask

"whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  See Schmidt v. Creedon, 639 F.3d 587, 598 (3d Cir. 2011).  "If it would not have

been clear to a reasonable officer what the law required under the facts alleged, then he is entitled

to qualified immunity."  Id.  Stated differently, for a right to be clearly established, "existing

precedent must have placed the statutory or constitutional question beyond debate."  See al-Kidd,

563 U.S. at 741.  As the Supreme Court recently noted, "[t]his demanding standard protects 'all

but the plainly incompetent or those who knowingly violate the law.'"  See District of Columbia

v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Accordingly, "there must be sufficient precedent at the time of action, factually similar to the

plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally

prohibited."  See Mammaro v. N.J. Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir.

2016) (quoting McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001)).

  The United States Supreme Court's decision in White v. Pauly, 137 S. Ct. 548 (2017),

clarifies the Court's inquiry in this regard.  In that case, the Supreme Court reaffirmed that its case

law "do[es] not require a case directly on point" for a right to be clearly established, but "existing

precedent must have placed the statutory or constitutional question beyond debate."[13]  See id. at

551 (internal quotation marks omitted) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)).

The Supreme Court reiterated that the clearly-established law "must be 'particularized' to the

facts of the case," and cautioned that the fact that a case presents a unique set of facts and

---

[13] There may be the rare "obvious case," however, where "a body of case law" is not necessary.
See Brosseau v. Haugen, 543 U.S. 194, 199 (2004).

circumstances is an "important indication" that a defendant's conduct at issue did not violate a "clearly established" right.  See id. at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

In support of his argument, Defendant Fisher asserts that "there is no robust consensus of case law putting [him] on notice that Plaintiff had a clearly established right to be moved to the other wing of the BMU, particularly when he was already sufficiently in protective custody being in the BMU, in response to verbal threats from other inmates, when Plaintiff himself was engaging in the same inappropriate conduct."  (Doc. No. 56 at 15.)  In the instant case, however, the question is not whether Plaintiff had a clearly established right to be moved to the other wing of the BMU.  Rather, the relevant inquiry is whether Defendant Fisher failed to protect Plaintiff from a risk of harm from another inmate.  "[T]he right to be protected against violence inflicted by other inmates is clearly established."  See Williams v. Smith, 507 F. App'x 260, 263 (3d Cir. 2012) (citing Beers-Capitol, 256 F.3d at 142 n.15).  The Court, therefore, concludes that Defendant Fisher is not entitled to qualified immunity.

## V.   CONCLUSION

For the foregoing reasons, Defendant Fisher's motion for summary judgment (Doc. No. 53) will be denied.  An appropriate Order follows.